IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:08CR238 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| RAFAEL POSADAS, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Rafael Posadas (Posadas) (Filing No. 13). Posadas is charged in the Indictment with the possession with intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1). **See** Filing No. 1. Posadas seeks to suppress evidence derived from his encounter with law enforcement officers at the Amtrak Train Station in Omaha, Nebraska, on April 17, 2008, and an ensuing search of his luggage resulting in the seizure of controlled substances and other items the government seeks into introduce into evidence.

An evidentiary hearing was held on Posadas's motion on August 18, 2008. Posadas was present for the hearing along with his counsel, J. William Gallup. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. During the hearing, the court heard the testimony of Investigators Jason Scott (Investigator Scott) and Alan Eberle (Investigator Eberle) of the Nebraska State Patrol (NSP) and the defendant Posadas. The court received into evidence the following exhibits: Exhibit 1 - photograph of a can containing cocaine; Exhibit 2 - photograph of a lock with key; Exhibit 3 - photograph of a lock without key; Exhibit 4 - photograph of opened cans; and Exhibit 5 - photograph of a bag. A transcript of the hearing (TR.) was filed on August 26, 2008 (Filing No. 26).

**FINDINGS OF FACT**

On April 17, 2008, Investigators Scott and Eberle, together with other law enforcement officers, were assigned to the Commercial Interdiction Unit (CIU) in Omaha,

Nebraska (TR. 7, 49). The CIU seeks to stem the flow of drugs and other illegal activity by concentrating on commercial transportation facilities (TR. 6). Around 7:00 in the morning of April 17th, the eastbound Amtrak train arrived at the Omaha station (TR. 7). The investigators were dressed in civilian clothing, jeans and t-shirts and were armed but did not have their weapons exposed (TR. 9). As part of their routine, the officers enter the coach cars while the train is at the station and walk through the coach cars looking for suspicious persons and luggage (TR. 10-11). Upon entering the coach car, there is a series of shelves for carry-on luggage next to steps leading to the passenger compartment above where there are rows of seats with additional overhead storage bins (TR. 10). As the officers enter the coach car, they first examine by sight the luggage on the downstairs luggage shelves (TR. 11). On April 17, 2008, a bag caught Investigator Scott's attention on the downstairs luggage shelves of a coach car (TR. 12). The bag was new and Investigator Scott observed no identification tag on the bag (TR. 11-12). Investigator Scott noticed the bag had an aftermarket lock on the zipper of the main compartment of the bag (TR. 13-14). Investigator Scott testified, in his experience, it is unusual for luggage to have such locks because travelers are accustomed to unlocking their luggage for routine searches at trains stations and airports (TR. 15-16).

  Investigator Scott and the other officers took the bag upstairs to the passenger compartment to establish ownership of the bag (TR. 16). Investigator Scott carried the bag down the center aisle of the compartment and asked each passenger, individually, if the bag belonged to them (TR. 16). Two other officers were with Investigator Scott at the time (TR. 18). Investigator Scott reached the defendant, later identified as Posadas, who appeared to be trying to sleep (TR. 18). Investigator Scott touched Posadas, who sat up in his seat (TR. 18). Investigator Scott did not identify himself as law enforcement. Investigator Scott addressed Posadas with "excuse me, is this your bag?" (TR. 18). Posadas did a double take of the bag and said, "no, it's not" (TR. 18, 47). Posadas then "pretended" to go back to sleep (TR. 44, 55). Posadas was the only passenger who had an unusual reaction to bag, the other passengers acted curious, but disinterested in the bag (TR. 44, 57-58). Investigator Eberle saw Posadas appear to pretend he was sleeping, but occasionally open his eyes and look around at the officers after they passed (TR. 57-

58).  Investigator Scott continued through the rest of the passengers on that coach without any claim of ownership (TR. 18-19, 32).  Investigator Scott took the bag downstairs and opened it, finding four large hominy cans, one partially unsealed containing cocaine (TR. 19-20, 33).  The bag was removed from the train for further investigation (TR. 33).

After seeing the large cans, Investigator Eberle returned to talk to Posadas, based on his unusual response to the questions and suspect bag (TR. 58, 86).  Posadas had moved from his previous seat to another seat nearer to the front of the coach compartment, but returned to his original seat after the officers walked through (TR. 58-60). Investigator Eberle introduced himself as an investigator with the state police and asked if he could ask Posadas a couple questions (TR. 60).  Posadas turned to face Investigator Eberle, both standing in the aisle, and answered the questions posed (TR. 61, 64). Posadas stated he was traveling from California to Cincinnati to visit his girlfriend for a few weeks (TR. 61).  Posadas gave the first name, but would not give the last name of his girlfriend, which Investigator Eberle found suspicious (TR. 61-62).  Posadas provided his identification and a one-way train ticket paid for with cash (TR. 62, 79).  Posadas was unusually nervous and shaking uncontrollably, with his nervousness increasing over the course of the encounter (TR. 62-63).  Investigator Lutter arrived and conducted a records check on Posadas (TR. 63).

Investigator Eberle asked Posadas if he had anything illegal with him like guns, drugs or bombs (TR. 65).  Posadas stated "no" (TR. 65).  Investigator Eberle then asked if the officers could conduct a search of Posadas's person and the suitcase that was on the seat near Posadas, a suitcase Posadas had earlier looked through himself (TR. 59-60, 65).  Posadas said, "yes, that is fine" (TR. 65).  Investigator Eberle noticed Posadas was breathing heavily and sweat was on his forehead (TR. 66).  Posadas was cooperative and did not ask any questions, but did not maintain normal eye contact (TR. 66-67). Investigator Eberle did not smell the odor of alcohol nor believe Posadas was under the influence of any drugs (TR. 66).  Investigator Eberle conducted a pat-down search of Posadas in the aisle of the train and began to search the suitcase (TR. 67).  At that time, Investigator Lutter told Investigator Eberle that Posadas has a positive criminal history for transporting narcotics (TR. 67).  Also at that time, an announcement was made that the

train was preparing to depart (TR. 68). Investigator Eberle asked Posadas if he would mind stepping off the train so they could discuss his travel (TR. 68). Posadas said, "ok" and zipped up his suitcase (TR. 68). Investigator Eberle testified he motioned toward the stairs and Posadas carried his suitcase, walking in front of the officers (TR. 69). Investigator Eberle stated that if Posadas had declined, Posadas would have been detained and escorted off of the train (TR. 78).

As Investigator Eberle and Posadas were walking to the train terminal, Investigator Eberle explained to Posadas that the officers believed Posadas was tied to another bag, in which the officers found contraband (TR. 70). Investigator Eberle explained the officers would like to search Posadas and his suitcase to determine if there were anything in his possession tied to the suspect bag (TR. 70). Investigator Eberle also gave Posadas a *Miranda* warning (TR. 70-71). Posadas nodded that he understood and agreed to talk to the officers (TR. 71-72). The officers located a key in Posadas's suitcase, which fit the lock on the suspect bag (TR. 27-28, 73). Posadas was placed under arrest and made a brief post-arrest statement (TR. 73).

Posadas testified he did not voluntarily leave the train, but was told to exit the train as it was leaving (TR. 96). Posadas did not think he had any choice but to exit the train (TR. 96). Additionally, Posadas testified he did not carry his suitcase off the train, an officer did so (TR. 96). However, Posadas testified he did not know the men were police officers until he was read his *Miranda* rights, after getting off of the train (TR. 99). Posadas testified he did not consent to a search of his person or his suitcase, nor did he ever deny ownership of the subject bag, pictured in Exhibit 5 (TR. 97). Posadas explained he was aware of his constitutional rights due to his prior experience with law enforcement and knew he had the right to refuse consent to search (TR. 97). Posadas admitted he had been arrested several times in the past (TR. 99).

To some extent, a credibility determination is necessary for determination of the legal issues in this matter. The court finds the investigators more credible than Posadas. This determination is made based upon each of the witnesses' demeanor during the hearing, intelligence, memory, motives, general reasonableness and consistency with other

testimony. Based on this credibility determination, the court discredits Posadas' testimony in its entirety.

## LEGAL ANALYSIS

The defendant urges the court to grant the motion to suppress for two reasons. The defendant argues the investigators conducted an illegal seizure of the subject bag when they removed it from the train's storage area without legal justification. Further, the defendant contends he did not give consent to search the subject bag, his suitcase or his person. In contrast, the government argues the subject bag had been abandoned and the defendant later voluntarily consented to the search of his suitcase.

**A.    Seizure**

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." *U.S. Const. amend. IV*. The Fourth Amendment protects an individual's privacy interests in the contents of personal luggage. *United States v. Place*, 462 U.S. 696, 707 (1983); *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 1999). However, "not every governmental interference with a person's property constitutes a seizure of that property under the Constitution." *United States v. Va Lerie*, 424 F.3d 694, 702, 706 (8th Cir. 2005) (en banc). A seizure occurs only when law enforcement "meaningfully interfere[s]" with an individual's possessory interests in the property. *Id.* at 701 (**quoting** *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Courts focus on three factors when considering whether law enforcement's interference with personal belongings constitutes an unlawful seizure. The court must determine whether law enforcement's detention of the parcel (1) delayed a passenger's travel or significantly impacted the passenger's freedom of movement; (2) delayed the parcel's timely delivery; or (3) deprived the commercial carrier of its custody of the parcel. *Va Lerie*, 424 F.3d at 707. Under any one of these conditions, the government must show there was sufficient information at the time of the seizure for a reasonable officer to suspect the parcel contained contraband or evidence of illegal activity. **See** *id.*

At a basic level, the facts presented in this case are no different than the facts of ***Va Lerie***. The officers identified a new piece of luggage for which they sought consent to search. The officers removed the luggage from the luggage compartment to attempt to make contact with the owner of the luggage. Similarly, an application of the ***Va Lerie*** factors to the facts of this case requires the conclusion that no seizure occured.

First, removal of the luggage from the downstairs luggage shelves in an attempt to seek consent to search did not delay the defendant's travel or impact his freedom of movement. Although the train was preparing to depart, it was not in imminent danger of departure. Further, the officers did not remove the luggage from the train. Instead, the officers kept the subject luggage in the same compartment where it was found, in an attempt to identify the owner. The defendant's freedom of movement was not impaired as he actually moved from his seat to another passenger compartment, then back to his seat after the officers removed the subject luggage below the seating area.[1]

Second, removal of the subject luggage from the downstairs luggage shelves did not affect the timely delivery of the luggage. There is no evidence to suggest the luggage would not have remained on the train and returned to the luggage shelves, despite the discovery of contraband. The fact the subject luggage was not "checked" does not materially change the analysis. The subject luggage had been placed on the luggage shelves for storage, it had not been kept in a passenger's immediate possession or even in a passenger's line of sight. Such luggage is kept in a public area and may be moved or observed by passengers and train employees, alike. Unlike checked luggage, the stored luggage may also be accessed by the owner-passenger periodically. Here, the officers did not remove the subject luggage from the train coach compartment where the owner had originally stowed it, until contraband was found. Further, no train passenger asserted an ownership interest in, or sought possession of, the subject luggage from the time officers removed it from the luggage shelves.

Third, based on the status of the luggage as stored, not checked, a passenger would have the expectation that passengers, train employees or others may have access

---

[1] Unlike the more confined and limited space in a bus, the train provided the defendant with additional areas for movement, which would not have required the defendant to risk missing the next leg of his journey.

to and observe the luggage.  Additionally, since the luggage did not have a name tag it may have been difficult to merely request the owner's presence near the luggage shelves.  The officers did not act unreasonably by moving the subject luggage to the passenger seating area to ascertain ownership.  The officers did not exert dominion and control over the subject luggage such that the carrier was deprived of its custody by conversion or removal from the area.  Accordingly, the removal of the subject luggage from the luggage shelves to ascertain ownership and seek consent to search did not constitute a meaningful interference with a train passenger's possessory interest in the luggage.

**B.    Abandonment**

"A warrantless search of abandoned property does not violate the Fourth Amendment, as any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. James*, 353 F.3d 606, 615-16 (8th Cir. 2003); **see** *Abel v. United States*, 362 U.S. 217, 241 (1960).  Alternatively, the defendant may lack standing to contest such a search.  **See** *United States v. Thompson*, 359 F. Supp. 2d 862, 865-66 (D. N.D. 2005) (listing cases).  "Whether an abandonment has occurred is determined on the basis of objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997).  To determine whether an item is abandoned, the court evaluates the circumstances including denial of ownership and physical relinquishment of the property. *James*, 353 F.3d at 616; *United States v. Caballero-Chavez*, 260 F.3d 863, 866-67 (8th Cir. 2001); **see** *United States v. Taylor*, 462 F.3d 1023, 1026 (8th Cir. 2006) (holding property abandoned when thrown away by suspect during pursuit).

Here, the defendant denied ownership of the subject bag or remained silent went asked if it were his and allowed the officers to question each passenger in the coach compartment.  By denying ownership of the bag, the defendant abandoned the bag.  **See** *United States v. Sanders*, 130 F.3d 1316, 1317-18 (8th Cir. 1997) ("[The Defendant's] statements to the officers that he did not own the bag were sufficient to constitute abandonment" even if the officers knew he was lying.  "The Fourth Amendment only protects privacy.  It does not immunize people who, finding themselves in a compromising

situation, voluntarily trade their interest in privacy for a chance to escape incrimination, no matter how unwise the decision may seem in retrospect."). The court concludes the defendant had no expectation of privacy in the subject bag and no standing to challenge the constitutionality of the investigator's search. **See** *United States v. Jones*, 556 F. Supp. 2d 985, (E.D. Mo. 2008) (an express disclaimer of ownership interest shows a defendant lacks sufficient privacy interest in item seized to support a motion to suppress); **see also** *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000). The defendant's statements and actions or inaction were sufficient to constitute abandonment and support a lack of standing as to the subject bag only. The defendant has a clear ownership interest in the suitcase he was found with on the train.

**C.    Encounter**

Encounters between the police and citizens fall into three general categories:

(1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, **see, e.g.,** *Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008); *United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006);

(2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, **see, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *Griffith*, 533 F.3d at 983-84; *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007); and

(3) physical arrests, which must be supported by probable cause. *U.S. Const. amend. IV*.

The government has the burden to prove the personal encounter was voluntary, or that justification otherwise existed for each increasingly intrusive restraint on the defendant. **See** *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004) ("The government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion, and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority.").

"Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *Griffith*, 533 F.3d at 983.

The encounter between Investigator Scott and Posadas was consensual and voluntary. Although Investigator Scott touched Posadas to get his attention, the encounter was brief and had no coercive effect on Posadas. Accordingly, the encounter was not a seizure and does not implicate the Fourth Amendment. However, the encounter does have some bearing on the totality of the circumstances when assessing the encounter between Investigator Eberle and Posadas.

The encounter between Investigator Eberle and Posadas began as a consensual or voluntary encounter. Both men were standing in the aisle of the train and after some discussion a second officer arrived. The officers used Posadas's information to obtain a records check and the Posadas became increasingly nervous. The encounter occurred in view of several of the train's passengers. Investigator Eberle sought consent to conduct a pat-down and search Posadas's suitcase, which was already open on a train seat near Posadas. The train was preparing to leave and the occupants received information the train would be departing soon. At that time, Investigator Eberle asked Posadas to step off of the train.

While there is no bright-line rule to distinguish a consensual encounter from an investigative detention, the court must assess whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Griffith*, 533 F.3d at 983 (**quoting** *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Under the circumstances here, a reasonable person would have believed he was not free to refuse the officers and remain on the train. The court finds police conduct had a coercive effect when taken as a whole, particularly where the train was nearing departure and the officers had some control over Posadas's identification, ticket and possessions. *Id.*

"It is well established, of course, that a law enforcement officer may detain a person for investigation without probable cause to arrest if the officer 'has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *United States v.*

9

*Maltais*, 403 F.3d 550, 554 (8th Cir. 2005) (**quoting** *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation and citation omitted)). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994). "[A]n officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation to provide justification for a stop." *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003). "Reasonable suspicion does not, however, exist solely on the basis of an officer's hunch." *Griffith*, 533 F.3d at 983. Officers may continue the detention for a reasonable period to verify or dispel the suspicion. *Maltais*, 403 F.3d at 556.

Here, the officers based the encounter with Posadas on a hunch. The officers knew only that Posadas did a double take when he saw the suspect bag, but denied ownership; Posadas was not in his seat when the officers returned to talk to him; Posadas was traveling on a one-way ticket from California to Cincinnati to visit his girlfriend, for whom he would not give a last name; the ticket had been purchased with cash; Posadas was unusually nervous; and Posadas had a positive criminal history for transporting narcotics. It is understandable that the officers wanted to get off of the train to continue their investigation of Posadas. However, no reasonable suspicion existed to detain Posadas and remove him from the train, in order to continue the investigation. Under these circumstances, while Posadas purportedly gave his consent to leave to the train, such consent was not voluntarily given. Thus, Posadas was subject to an illegal detention.

**D.     Exclusionary Rule**

Because the defendant was subject to an illegal detention, the court must determine whether his subsequent statements should be excluded, on that basis alone. The exclusionary rule prohibits the admission of evidence unconstitutionally obtained. *Weeks v. United States*, 232 U.S. 383 (1914). The rule also applies to evidence, tangible and testimonial, which was derived, directly or indirectly, from the unconstitutionally obtained evidence, i.e., the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471,

487 (1963); *Nardone v. United States*, 308 U.S. 338 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920); *United States v. Fellers*, 397 F.3d 1090, 1094 (8th Cir. 2005). Even though the exclusionary rule may require the exclusion of all evidence obtained by exploitation of an illegal search and seizure, the evidence may still be admissible into evidence if the evidence is gained by means sufficiently distinguishable to be purged of the primary taint of the illegality. To that extent, three general exceptions have been carved from the exclusionary rule. The first exception has been called the "attenuated connection" where the chain between the challenged evidence and the primary taint of illegality is so long or only linked by sophisticated argument that exclusion of the evidence is not warranted. See *Wong Sun*, 371 U.S. at 487-88; *Nardone*, 308 U.S. at 338. The second exception has been called the "independent source" exception where evidence is admissible if the government can show it derived the evidence from a lawful source independent of the illegal conduct giving rise to the primary taint. See *Silverthorne Lumber Co.*, 251 U.S. at 385. The third exception has been labeled the "inevitable discovery" doctrine where the government can establish that it would have inevitably discovered the challenged evidence without reference to the illegal conduct giving rise to the primary taint. See *Nix v. Williams*, 467 U.S. 431 (1984).

The defendant's illegal detention when he was removed from the train directly contributed to the search of the suitcase and discovery of the key. The government has failed to show any exception to the exclusionary rule may apply. However, neither the defendant's detention, nor the search of the suitcase led to the discovery of contraband in the subject bag, which was abandoned. Therefore, the court will recommend only that evidence obtained following the defendant's removal from the train be suppressed.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Posadas's motion to suppress (Filing No. 13) be granted with respect to the discovery of any evidence obtained following the defendant's removal from the train, and denied in all other respects.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 16th day of October, 2008.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge